## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Mark Sundberg, individually, and as Special
Administrator for the Estate of Andrew Tekle
Sundberg,

                    Plaintiff,

vs.

City of Minneapolis; Officer Zachary
Seraphine, Officer Aaron Pearson, Sergeant
Shawn Kelly, and Lieutenant Thomas
Campbell,
                    Defendants.

Court File No.


**COMPLAINT WITH
JURY DEMAND**

---

For his Complaint, Plaintiff Mark Sundberg, hereby states and alleges upon knowledge,

information, and belief as follows:

## <u>INTRODUCTION</u>

1. Andrew Tekle Sundberg was killed by Minneapolis Police Department snipers hours

    after the scene was made safe. Mr. Sundberg was restricted to his apartment. Officers

    were in covered positions and armored vehicles. Traffic was detoured from the street.

    Civilians were evacuated from the buildings. Mr. Sundberg was disabled by reason of

    intellectual and mental health disabilities which the officers on the scene could

    observe, and of which the police were informed by the Plaintiff and Mr. Sundberg's

    mother. Plaintiff and Mr. Sundberg's mother also requested a Black officer to

    communicate with Mr. Sundberg. Nonetheless, despite Plaintiff's notice of the need

1

for accommodation, the requests of his parents on scene, and the requirement under

Minn. Stat. § 403.03, subd.1 to dispatch a mental health crisis team, the police did not

employ a mental health crisis team, or any mental health worker.  In doing so, they

failed to make a reasonable accommodation to a handicapped individual while

providing a public service, in violation of the Americans with Disabilities Act (ADA).

Lieutenant Thomas Campbell was the overall commander of the operation, and failed

to comply with the ADA. MPD decided to use the 40 mm weapon mounted in a turret

on the armored Bearcat to try and remove the window glass and curtain from Mr.

Sundberg's window prior to using tear gas and fired 19 less lethal rounds through the

window. Minutes before Mr. Sundberg's death, he was hanging out of his second-

floor apartment window speaking gibberish (as officers characterized it.)  Sergeant

Shawn Kelly falsely announced over the radio that Mr. Sundberg had threatened to

shoot police officers.  Sergeant Kelly's false statement put the snipers stationed on the

roof across the street in a falsely heightened state of alert. Police officers were behind

walls, in the armored bearcat, and at the ends of the block. Mr. Sundberg appeared in

the window again and began knocking out the broken glass with what may have been

a handgun. Officer Aaron Pearson, one of the snipers, saw Mr. Sundberg from his

prone position on the dark rooftop 75 yards away, believed that Mr. Sundberg, in the

glare of the police spotlights, was a deadly danger to himself and others, announced

"gun" and shot Mr. Sundberg through the torso with his sniper rifle.  Officer Zachary

Seraphine, the other sniper on the rooftop, heard the gunshot, and though he did not

know whether the shot was from Mr. Sundberg (who he was observing through his

2

scope), from the police, or from some other party, Officer Seraphine fired his sniper rifle, striking Mr. Sundberg in the upper chest. Officer Pearson's actions were not those of a reasonable officer as Mr. Sundberg did not pose a danger of death or bodily harm at the time he fired. Officer Seraphine's action in firing at the sound of a gunshot was not the action of a reasonable Officer. The City of Minneapolis and Hennepin County has a mental health team on duty 24 hours a day, seven days a week. Mr. Sundberg's handgun had no round in the chamber, and was unable to fire in that condition.

2. By order dated July 8, 2025, Hennepin County District Court Judge William H. Koch appointed Mark Sundberg as Special Administrator for the Estate of Mr. Andrew Tekle Sundberg. *In Re the Estate of Andrew Tekle Sundberg,* No. 27-PA-PR-25-957. (D. Minn. 2025).

3. Plaintiff seeks injunctive relief ordering changes in training and policies within the Minneapolis Police Department to prevent violation of the Americans with Disabilities Act, compensatory damages in excess of $100,000, punitive damages and costs and fees to include attorney fees.

4. Further, Mr. Andrew Sundberg's death resulted from a violation of his constitutional rights by the City of Minneapolis and Minneapolis Police Officers Zachary Seraphine and Aaron Pearson. Plaintiff asserts these officers violated Mr. Sundberg's well-settled federal civil rights while acting under color of law.

5. Further, this action is for money damages brought pursuant to 42 U.S.C. § 1983 and 1988, and the Fourth and/or Fourteenth Amendment to the United States Constitution,

3

and pursuant to Minnesota state law, against the City of Minneapolis and Minneapolis Police Officers Zachary Seraphine and Aaron Pearson.

6. Plaintiff further asserts a claim against the City of Minneapolis under Monell v. Department of Social Services, 436 U.S. 658 (1975), and Canton v. Harris, 489 U.S. 378 (1989).

## JURISDICTION AND VENUE

7. This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331, § 1343, 42 U.S.C. §12133, the Civil Rights Act of 1871, and Title 42 U.S.C. §1983 to redress and enjoin the illegal practices alleged in this Complaint.

8. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to Title 28, United States Code, §1367.

9. Venue is proper in the District of Minnesota under 28 U.S.C. § 1391 (b) because Defendant City of Minneapolis is located in this district, the other individually named Defendants are employed in this district, and the incidents in question occurred in this district.

## STATEMENT OF FACTS

10. Andrew Tekle Sundberg, known as "Tekle" to his family and friends, was adopted from Ethiopia when he was four years old by Plaintiff Mark Sundberg and his wife, Cindy Sundberg.

11. Andrew Sundberg was an active child who grew into an independent, strong young man.

4

12. Andrew Sundberg shared a love of plants and gardening with his mom, Cindy.

13. Andrew Sundberg loved cooking, and sharing recipes and spices with his dad, Mark.

14. Andrew Sundberg struggled with mental health issues.

15. Andrew Sundberg had post-traumatic stress disorder (PTSD) from early childhood trauma, which resulted in a thirty-second processing delay between stimuli and responses.

16. Andrew Sundberg suffered a traumatic brain injury at the age of 13, which exacerbated his earlier mental health issues.

17. Andrew Sundberg was diagnosed with attention deficit/hyperactivity disorder, struggled with depression, and engaged in self-harming behaviors.

18. While in school, Andrew Sundberg had an individualized education program ("IEP"), a customized plan developed for students with disabilities to ensure their specific educational needs are identified and met.

19. Under the federal Individuals with Disabilities Education Act (IDEA), every public school that receives federal funding is required to provide an IEP for each eligible child with a disability.

20. To qualify for an IEP under IDEA, a student must be a child with a disability, including disability such as intellectual disabilities, serious emotional disturbance, autism, or specific learning disabilities. 20 U.S.C. § 1401 (3).

21. Andrew Sundberg lived alone in Apartment #318 at 904 21st Avenue S, Minneapolis, Minnesota.

22. Andrew Sundberg was only 20 years old when he was shot and killed by Minneapolis Police snipers Zachary Seraphine and Aaron Pearson.

**Initial Shooting and Response**

23. On July 13, 2022, Minneapolis Police Officers were dispatched around 9:30pm to a report of shots fired inside the apartment building where Andrew Sundberg resided.

24. The apartment building is a three-story multi-unit building complex.

25. The 911 call came from a woman in the apartment building who reported the shots were coming from the apartment across the hall ("Apartment 318").

26. Apartment 318 is a studio apartment on the third floor, with an exterior window that faces eastward and overlooks 21st Avenue.

27. Apartment 318 sits directly adjacent to the north stairwell and the north fire door.

28. The layout of Apartment 318 is such that upon entry into the unit, a bathroom is to the immediate left.

29. The bathroom mirror is placed on the westerly wall that runs parallel to the exterior hallway.

30. Directly across from the westerly bathroom wall is the front door to Apartment 308, the residence of the 911 caller.

31. The gunshots reported by the 911 caller originated from the bathroom of Apartment 318, entered through the bathroom mirror, through the wall, and passed through the front door of Apartment 308.

32. Around 9:41pm, the first officer, Officer Nicholas Kapinos, arrived on scene and attempted to gain entry to the hallway of Apartments 318 and 308 from the north stairwell.

33. The north fire door was locked, so Officer Kapinos knocked repeatedly on the fire door.

34. Officer Kapinos did not announce himself as police.

35. At one point, Officer Kapinos radios to dispatch to inform the 911 caller to come to the north side stairwell to let him in.

36. The dispatcher radios back that the 911 caller may have some difficulty doing so because she hears banging on her door like someone is trying to get in.

37. Officer Kapinos notifies dispatch, "yeah, that's me."

38. Officer Kapinos then takes a step back from the door and yells, "police."

39. He then knocks on the door and announces "police department" again.

40. Three shots enter the north side fire door.

41. Moments later, the 911 caller and her two children are evacuated from her apartment building.

42. No additional shots are fired from Apartment 318 past approximately 9:50pm.

43. Shortly after, officers aired over the radio that the handgun used by the suspect was a regular .45 caliber handgun.

**MPD Officers Begin Tactical Operation**

44. Additional MPD officers began responding to the scene.

45. Some of the officers gained access into the apartment building on the south side.

46. The officers set up an inner perimeter around Apartment #318 in the north and south stairwells.

47. Officers began immediately evacuating residents from all three floors of the apartment complex.

48. Within an hour of the initial incident, the vast majority of the apartment building had been evacuated.

49. By the time that the MPD SWAT Executive Officer (XO), Sergeant Troy Carlson, who is in charge of SWAT tactical operations, arrived on scene around 10:30pm, on-duty SWAT team members had already organized:

   a. an immediate response team (IRT) of SWAT team members inside of the apartment building;

   b. a Bearcat, or armored tactical police vehicle on 21st Avenue in front of the building, and,

   c. a "Sierra 1" sniper rifle team on the rooftop of an apartment across the street from Apartment #318.

50. Within the next twenty minutes, MPD identified Andrew Tekle Sundberg as the shooting suspect and obtained a search warrant for his apartment.

51. SWAT Sergeant Shawn Kelly forwarded to all SWAT Team members the following three photos of Mr. Sundberg.

  

52. By this time, a temporary command post had been set up on Franklin Avenue down the street from the apartment building.

53. A two-block radius perimeter was set up around the area.

54. Sgt. Carlson met with Lieutenant Thomas Campbell, the SWAT Commander in charge of all SWAT operations, at the command post and began to formulate a plan to control the situation.

55. Around 11:30pm, an Operation 100 was called by Lieutenant Campbell, with approval from Deputy Chief Kathy Waite.

56. An Operation 100 is a full, MPD SWAT Unit call out where on and off-duty SWAT Tactical, Negotiators, and Tech Team Members are called to respond to a hostile event such as an active shooter or a barricaded suspect.

57. As additional SWAT personnel responded to the scene, announcements began over the long-range acoustic device (LRAD) affixed on the BearCat vehicle for the suspect to surrender.

58. According to Sgt. Carlson, "the overall goal of the SWAT operation was to get the suspect to surrender as there was no immediate threat to the public as the suspect was

contained, to our knowledge no one had been injured and we did not believe that the

suspect had any hostages/additional people in his apartment."

59. After the Mobile Command One (MC1) vehicle arrived, this vehicle was set up as the

permanent command post near the Holiday gas station on Franklin Avenue.

60. Sgt. Carlson, Lt. Campbell, Deputy Chief Fors, and Deputy Chief Waite convened in

MC1 to oversee the operation.

**Mr. Sundberg's Parents Arrive on Scene**

61. Around midnight, Mr. Sundberg's parents, Mark and Cindy Sundberg, responded to

the scene.

62. Mark and Cindy Sundberg were kept by MPD officers on the backside of Mr.

Sundberg's apartment building in a fire department parking lot for the duration of the

incident.

63. Mark and Cindy Sundberg informed MPD Crisis Negotiators the following

information about Mr. Sundberg's mental health history: (1) Mr. Sundberg had a

thirty-second processing delay due to trauma from his childhood, (2) attention-

deficit/hyperactivity disorder, (3) a past history of suicide attempts (cutting wrists),

(4) depression, (5) Mr. Sundberg had seen therapists in the past, and (6) he was non-

violent.

64. MPD Crisis Negotiator Russel Cragin relayed this information to Lt. Campbell and

Sgt. Carlson.

65. The information was also written on the whiteboard inside the SWAT Negotiator

vehicle parked on the 2000 block of Franklin Avenue.

66. Cindy Sundberg also informed Officer Cragin that Tekle did not trust the police, that he'd respond better to a Black officer than a White officer, and mentioned that Tekle would be particularly unresponsive to them because he was afraid of being another Black man killed by the police.

67. Mark and Cindy Sundberg also requested that MPD change the negotiators to a Black man or woman.

68. Their request was ignored.

69. Mark and Cindy Sundberg begged officers on scene multiple times to not shoot their son.

70. Numerous officers, including Ofc. Cragin, and civilian MPD staff member Katie Miller told the parents that they weren't going to shoot Mr. Sundberg.

71. Numerous officers informed the Sundbergs that rubber bullets were the only projectiles they were going to use on their son.

72. At one point when Cindy went to use the restroom, Ofc. Cragin made several comments to Mark Sundberg that he didn't understand why Cindy kept bringing up black men being shot by police.

73. Ofc. Cragin told Mark he didn't understand why people believe police would kill in situations like this one.

74. During this time, MPD Crisis Negotiators were delivering announcements over the LRAD that was affixed to the BearCat vehicle in front of Tekle's apartment.

75. The announcements were limited to statements that Mr. Sundberg was under arrest, that they had a search warrant for his apartment, and for him to surrender to officers.

11

76. Ofc. Cragin also had Mark Sundberg record audio and video statements that were played over the LRAD and sent via text message to Mr. Sundberg's phone number.

77. MPD officers instructed Mark Sundberg on what to say in the recordings and had him re-record audios they disapproved of.

78. For example, in the first recording, Mark Sundberg said, "Tekle, this is your dad again. I love you, I know you love me. Please talk to the negotiators. They really got to talk to you. Please do it. For me. Thanks."

79. Ofc. Cragin had Mark Sundberg re-record to say, "Tekle, this is your dad again. I need you to talk to the negotiators. They just want to talk to you right now. Just give them 30 seconds, that's all. Just to know what's going on, not asking you to come out, just talk to the negotiators, they're going to call."

80. Mark Sundberg knew that texting or calling would be ineffective for communicating with Tekle, because based on his experience with his son—and the fact that Tekle wasn't responding—he knew Tekle wouldn't look at his phone anyway.

81. Mark Sundberg told officers that Andrew Sundberg knew Mark wasn't physically present, even when they used a recording of his voice, and that this would not be effective in gaining his trust or cooperation.

82. Mark and Cindy Sundberg made numerous pleas to law enforcement officers to allow them to speak freely with Andrew Sundberg or to be let into the apartment building to attempt to speak with him.

83. Mark and Cindy Sundberg requests were denied.

84. In addition to the pre-recorded statements, MPD Crisis Negotiators bombarded Mr. Sundberg's phone with near constant phone calls, text messages, and voicemails.

85. Ofc. Krystal Klund, who sent the majority of the communications, estimated a total of approximately 250-300 phone calls, 15-20 voicemails, and 50 text messages were sent.

86. Ofc. Klund told other officers that she would call Andrew Sundberg non-stop until he answered.

87. Andrew Sundberg did not respond to any of these communications.

88. Negotiators provided Andrew Sundberg with a phone number to call so they could communicate with him over the phone.

89. Andrew Sundberg did not call this number at any point throughout the incident.

90. At certain points, Andrew Sundberg turned off his phone or sent calls directly to voicemail.

91. Mark Sundberg informed officers on scene, including Officer Cragin, that the MPD's attempts at communication, including the announcements, calls, and texts, would be ineffective and would only escalate his son.

92. Mark Sundberg explained to officers that his son had PTSD, and based on past conversations, Mr. Sundberg believed that if he put his hands up and walked toward police, they would shoot him.

**Tactical Response Despite Mental Health Concerns**

93. As stated in paragraphs 63-64, Lt. Campbell and Sgt. Carlson were made aware of Andrew Sundberg's mental health issues.

94. At one point, Officer Richard Walker was informed by a few neighbors that Andrew Sundberg had a history of not normal behaviors and possible PIC (Person in Crisis) related issues.

95. Upon learning this, Officer Richard Walker went to the tactical vehicle and advised Lieutenant Campbell of this information.

96. Other officers and civilians noted that Andrew Sundberg's behavior was strange.

97. Throughout the incident, Andrew Sundberg would come to his apartment window and would sometimes step onto the ledge of the window and hang outside of it.

98. Andrew Sundberg appeared to take videos and photos of himself with his cell phone while he stood outside of the window.

99. Numerous officers on the scene reported that Andrew Sundberg made "unintelligible statements," when he came to the window or hung outside of it.

100. When his speech was discernible, Andrew Sundberg can be heard saying bizarre statements such as, "I'm the government! Guess whaaaaat?"

101. Numerous neighbors knew Andrew Sundberg to be "off", that he had a mental issue, and was recently exhibiting bizarre behavior such as standing randomly in front of individual's cars.

102. MPD sniper Zachary Seraphine, who was observing Andrew Sundberg's behavior through the scope of his sniper rifle, stated that he considered the possibility of a "mental health situation."

103.    MPD sniper Aaron Pearson also assessed the possibility of a mental health problem due to his behavior and Andrew Sundberg's non-response to communications from officers.

104.    The MPD Command staff in MC1 did not make any attempts to address the possibility of a mental health situation.

105.    They did not consult with any mental health professionals.

106.    Instead, Deputy Chief Waite replaced the officer issuing announcements, Sgt. Corey Schmidt, with Ofc. Klund around 2:38am.

107.    Ofc. Klund told Mr. Sundberg over the LRAD that she was the one who had been repeatedly calling and texting him.

108.    She then proceeded to issue the same announcements as the previous officer: that Mr. Sundberg was under arrest, that there was a search warrant for his arrest, and to exit his apartment with his hands up.

109.    Every time Mr. Sundberg emerged on the window ledge and provided officers with an opportunity to establish a meaningful dialogue, Ofc. Klund repeated the same announcements.

110.    This continued for a little under an hour before a decision was made to give Mr. Sundberg a final warning to surrender or else officers would break out his windows with less-lethal munitions.

**The Shooting**

111.    The final announcement was given at 3:28am.

112.    Andrew Sundberg did not respond.

113.   A minute later, MPD Officer Martin fired nineteen less-lethal 40mm rounds at Mr. Sundberg's apartment windows in an attempt to break out the windows and knock down the curtain rod.

114.   The less-lethal rounds broke the glass of the apartment windows and opened the curtains but failed to bring down the curtain rod.

115.   Andrew Sundberg did not respond to the less-lethal rounds, but proceeded to turn up the volume on his music.

116.   Officers then began to prepare a plan to gas Andrew Sundberg into surrendering.

117.   Around 4:05am, a gas plan was formalized by MPD command staff and officers made preparations to bring gas munitions to the BearCat.

118.   Before officers deployed gas munitions into Andrew Sundberg's apartment, Andrew Sundberg opened his window again and stepped out onto the ledge.

119.   Andrew Sundberg had a phone in his hand and appeared to be recording himself.

120.   A short while later, Andrew Sundberg returned into his apartment.

121.   Andrew Sundberg left his window open but pulled the curtain closed.

122.   Andrew Sundberg turned up the volume on his music inside the apartment.

123.   A short while later, Andrew Sundberg returned to stand on the window ledge, holding what appeared to be a large mirror or a piece of artwork, and placed it above the air conditioner unit on the outside of the apartment building.

124.   While hanging out of the apartment window, Andrew Sundberg looked down and pointed with his index finger at officers who were standing near the apartment complex entryway.

125.    Sergeant Kelly, who was standing with other officers outside of the first-floor entryway, said to Andrew Sundberg, "Come out of your apartment door with your hands up!"

126.    While Andrew Sundberg pulled a cell phone out of his right pants pocket and pressed it to his ear, he said, "I don't care, [inaudible], you already knew. Ah, ah, ah, ah!"

127.    Sergeant Kelly continues to repeat to Andrew Sundberg that he is under arrest and to come out of his apartment, but Andrew Sundberg continued to speak into the phone in a disorganized and incoherent fashion.

128.    In response to Sergeant Kelly's announcements that he was under arrest and to come out of the apartment, Andrew Sundberg made the following statements,

   a.    "Ah, ah, ah, ah, I'm literally speaking it into you because I looked at you, you understood the voice."

   b.    "We already changed to exactly what he wanted so that's, no, that's, no, you, make you order, if he doesn't, you're gonna get yourself shot, first of all, that's the one voice that actually."

   c.    "You're actually pointing a gun at me."

129.    Sergeant Kelly continued making announcements, and then said, "Mr. Sundberg, we need you to come out and cooperate with us. We don't want to hurt you, we just want to go home. We want to make sure you get the help you need, come on out, come on out."

17

130.    Andrew Sundberg responded, "Nope, you're weird. Why? I wouldn't let them call you, no I did."

131.    Sergeant Kelly repeated, "Sir, can you come out of your apartment door with your hands up? You're under arrest."

132.    Tekle responded, "Tell them why, why, why."

133.    Sergeant Kelly transmitted over the radio, "He's talking to somebody on the phone, he's being very uncooperative with me, trying to tell him to come to the apartment door with his hands up."

134.    Sergeant Kelly made another announcement to Tekle to come out of the apartment with his hands up.

135.    Tekle could be heard saying, "Who you are, before I let her shoot, bitch, you think she...[inaudible], just be straight up, [inaudible] be subservient to her. If I knew, I would tell her why but that's not what we're talking about."

136.    Sergeant Kelly asked his colleagues to remind him of Mr. Sundberg's first name, and then repeated his refrain, "Andrew, come out of your apartment with your hands up. You're under arrest, it's the Minneapolis Police."

137.    Andrew Sundberg said, "You didn't even have the respect to shoot you, but criticize you [inaudible], and now look at you, lose your self-respect [inaudible] fuck yourself in the ass. If you don't wanna make, oh!"

138.    Andrew Sundberg stepped back inside the apartment window and out of view of the officers on the ground.

139.   Andrew Sundberg closed the windowpane, which Officers had previously broken with 40mm less-lethal rounds, and begins to break out the glass by kicking it.

140.   Sergeant Kelly transmitted over the radio, "he's threatening to shoot officers and he's breaking out some more of his window."

141.   Mr. Sundberg was not heard making any threats to shoot officers.

142.   Mr. Sundberg went back further into his apartment.

143.   About forty seconds later, Andrew Sundberg returns to the window with an object in his hand and begins to break out more glass in the window.

144.   At this time, police officers were behind the walls of the entryway, behind squad cars, in and behind the armored Bearcat vehicle, and hidden in the darkness of the rooftop 75 yards away.

145.   Andrew Sundberg was facing multiple police spotlights which prevented him from seeing into the darkness.

146.   At 4:18:34AM, MPD sniper Aaron Pearson fired the first shot.

147.   The first shot penetrated Andrew Sundberg's left shoulder.

148.   The second MPD sniper Zachary Seraphine heard the first shot, and though he did not know whether the first shot was from the police, from Andrew Sundberg or from elsewhere in the neighborhood, he fired a second shot four seconds after the first one.

149.   The second shot hit Andrew Sundberg in the central upper chest, ripping through his lungs and heart.

150.   Andrew Sundberg was pronounced dead at Hennepin Healthcare HCMC hospital at 4:39am.

151.    Andrew Sundberg's handgun was found without a bullet in the chamber.

**Pattern and Practice of Misconduct: DOJ and MDHR Findings**

152.    Following the murder of George Floyd by Minneapolis Police Officers in 2020, both the Minnesota Department of Human Rights (MDHR) and the United States Department of Justice opened pattern and practice investigations into the City of Minneapolis and the MPD.

153.    Both reports found that MPD engages in a pattern or practice of discriminatory, race-based policing.

***Minnesota Department of Human Rights Findings***

154.    On June 1, 2020, the Minnesota Department of Human Rights (MDHR) opened their investigation.

155.    On April 27, 2022, the MDHR announced its findings that there is probable cause that the City and MPD engage in a pattern or practice of race discrimination in violation of the Minnesota Human Rights Act.

156.    On July 23, 2023, District Court Judge Karen Janisch approved a court enforceable agreement between the Minnesota Department of Human Rights and the City of Minneapolis which requires the City and MPD to address its race-based policing. *State of Minn. v. City of Minneapolis*. No. 27-cv-23-4177 (D. Minn. 2023).

157.    The MDHR found that, while Black individuals make up approximately 19% of Minneapolis's population, they accounted for 63% of all use of force incidents recorded by MPD officers.

158.    To determine whether race, rather than factors like individual behavior or offense type, was the likely reason for higher rates of use of force, the MDHR compared incidents involving Black and white individuals in similar circumstances.

159.    Their analysis of use of force files and body-worn camera footage showed that race is likely the reason MPD officers use more severe force against Black individuals than white individuals in similar situations.

160.    The MDHR also found that although people of color and Indigenous individuals make up about 42% of Minneapolis's population, they accounted for 93% of all MPD officer-involved deaths between January 1, 2010, and February 2, 2022.

161.    The MDHR concluded that MPD's pattern of discriminatory policing is driven in part by its organizational culture and inadequate training and guidance, which worsen the department's pattern of race-based, discriminatory practices.

162.    The MDHR found that MPD's training is deficient and contributes to a pattern of race-based policing.

163.    MPD trainers are not properly vetted to ensure they are qualified, possess subject-matter expertise, understand or follow MPD policies and stated values, or have a track record of non-discriminatory policing.

164.    MPD training uses a paramilitary approach that demands unquestioned compliance which undermines MPD's written policies, such as officers' duty to intervene or duty to report unauthorized use of force.

165.   MPD training and organizational culture positions community members as the enemy and as oppositional to police officers. This us-versus-them approach is often coupled with unprofessional, racist, and other discriminatory conduct.

166.   MPD's training teaches an approach to policing that emphasizes aggression, resulting in unnecessary escalation and/or excessive force during encounters with community members.

167.   Escalation tactics include increasing exposure to a potential threat by: abandoning positions of cover, distance, concealment, or barriers; speeding up the pace of an incident, and communicating in an aggressive manner.

168.   Despite MPD's de-escalation policy, the MDHR found in a sample of 300 use-of-force incidents, MPD officers failed to de-escalate in more than half of incidents where it would be appropriate to do so.

169.   Additionally, MPD officers improperly escalated situations in nearly a third of those cases.

170.   MPD training for MPD sergeants and lieutenants is similarly deficient.

171.   MPD supervisors lack substantive instruction on key skills, such as mentoring, coaching, and evaluating officer performance.

172.   One high-level MPD official told the MDHR that prior to 2018, MPD offered little to no training on how to be an effective supervisor and offered inconsistent supervisor training from 2018 onward.

***U.S. Department of Justice Findings***

173.   On April 21, 2021, the Department of Justice ("DOJ") opened a pattern or practice investigation of MPD and the City.

174.   On June 16, 2023, the DOJ announced its findings that there was reasonable cause to believe that the City and MPD engage in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law.

175.   In January 2025, the DOJ and the City of Minneapolis agreed to a federal consent decree, but it was later dismissed by a federal judge after the incoming presidential administration changed the DOJ's enforcement priorities.

176.   On June 10, 2025, Minneapolis Mayor Jacob Frey signed Executive Order 2025-01, confirming the City's commitment to implementing the reforms outlined in the proposed federal consent decree, despite its dismissal.

177.   The DOJ found officers routinely use excessive force, often when no force is necessary.

178.   MPD officers often use excessive, unreasonable force, including deadly force, to obtain immediate compliance with orders, often without using meaningful de-escalation tactics.

179.   In its analysis of all 19 police shootings by the MPD between January 2016 and August 2022, the DOJ found that a significant number of them were unconstitutional uses of force in violation of the Fourth Amendment.

180.   The DOJ noted that MPD has failed to respond with effective, systemic reforms to prevent future unlawful shootings.

181.   The DOJ found probable cause to believe MPD engages in racial discrimination in violation of VI of the Civil Rights Act of 1964 and the Safe Streets Act.

182.   MPD disproportionately stops, searches, seizes, and uses force against Black people compared to White people.

183.   MPD has been on notice of racial disparities in policing tactics for years and has failed to sufficiently address them.

184.   Minneapolis Mayor Frey told the DOJ following the 2022 MDHR report that they knew, and continue to know, that there is disparate treatment of communities of color by MPD.

185.   The DOJ further found that the City and MPD discriminate against people with behavioral health disabilities in violation of the Americans with Disabilities Act.

186.   Between January 2016 and August 2022, almost 10% of emergency and non-emergency 911 calls were directly related to a behavioral health issue.

187.   When MPD officers respond to behavioral health calls, they often fail to use appropriate de-escalation tactics, such as giving the individual time and space, speaking slowly and calmly, and active listening.

188.   The DOJ identified numerous examples where MPD officers unnecessarily escalated situations and used avoidable force against people with behavioral health disabilities.

189.   For example, in 2017, MPD officers responded to a call involving a white man experiencing a mental health crisis. The man, who was shirtless, barefoot, and wearing pajama pants, was in his front yard. Neighbors informed the responding

officers that he had bipolar disorder, was unmedicated, and was in the midst of a

mental health episode. Although the man appeared agitated, he complied with

officers' commands to sit on his front steps. While he was seated, unarmed, and not

actively threatening anyone, an MPD officer discharged a taser without issuing a

warning. The man stood up in pain, fell to the ground, and was then handcuffed by

officers. Emergency medical services later arrived and sedated him. The incident

demonstrates MPD's practice of using force during mental health-related calls, even

where individuals are not posing an immediate threat.

190.    The DOJ noted that in behavioral health calls involving no violence, weapon, or

immediate threat of harm, a police response is inappropriate.

191.    Even in cases where a police response is required, the DOJ noted that MPD fails to

use a joint behavioral health and law enforcement response to respond with

individuals with behavioral health disabilities.

192.    For example, in 2018, MPD was dispatched without any behavioral health

responders after a man named Travis Jordan's girlfriend called the non-emergency

response line. Travis Jordan reportedly told his girlfriend that he would kill himself

and had sought to buy a gun "a few months ago." Without mentioning that timeframe,

dispatchers relayed to MPD that he "was looking to buy a gun." A supervisor directed

the officers not to force entry given that Mr. Jordan was alone and not a threat to

others, and suggested the officers call his girlfriend to try and convince him to

voluntarily leave the home. Officers were standing close to the home, however,

looking in windows and calling to Mr. Jordan to come out. Mr. Jordan, agitated, then

opened the front door holding a knife, yelling, "OK then, let's do this!" An officer shot and killed the man.

193.    The DOJ noted that in this case a well-coordinated joint response with behavioral health professionals and law enforcement would have been warranted here and that such strategies may have avoided the use of force that ended Mr. Jordan's life.

194.    The City's failure to provide meaningful services with individuals with behavioral disabilities stems in part from issues with dispatch, or the Minneapolis Emergency Communications Center (MECC).

195.    The MECC lacks the ability to adequately assess and appropriately dispatch behavioral health related calls for service.

196.    MECC staff noted that training on behavioral health response and response protocols are unclear.

197.    MECC staff reported that they are trained to send behavioral health crisis calls to police rather than the City's Behavioral Crisis Response (BCR) team, erring on the side of caution.

198.    The BCR was launched in December 2021, and its hours of operation were expanded to provide 24/7 services in April 2022.

199.    BCR is a team of unarmed, culturally responsive, and trauma informed mental health care professionals and practitioners.

200.    It is operated by Canopy Roots, a private local black-owned mental health services organization.

201.   The BCR team are trained to de-escalate, and specifically are trained to respond to crises where the individual has "out-of-control mood swings", "loss of touch with reality", and "paranoia."

202.   Dispatchers reported diverting many calls that were appropriate for BCR to police.

203.   MPD's training on behavioral health issues is inadequate and at times, factually inaccurate and biased against individuals with behavioral health disabilities.

204.   Since 2017, all MPD officers have received basic Crisis Intervention Team (CIT) training.

205.   The DOJ noted serious flaws in the training program, including biased messaging and inaccurate medical information.

206.   The training is not sufficient to educate officers on behavioral health issues, and officers underestimate the need for training at all. One officer told the DOJ that he did not need training to know someone is "off their rocker."

207.   At the time of Andrew Sundberg's death, the City's BCR team was available to respond to police calls.

208.   Additionally at the time of Andrew Sundberg's death, Hennepin County had a 24/7 mental health team available to respond to police calls.

**Additional Instances of City and MPD's Failure to Accommodate Individuals with Mental Disabilities**

209.   In June 2000, Minneapolis Police failed to call mental health professionals when responding to a loud music complaint call for a woman with bipolar disorder. One of the 911 callers noted that the woman, Barbara Schneider, was mentally ill and urged

police to contact her caretaker first. The first two responding officers opened Ms. Schneider's door and found her holding a knife, yelling obscenities. The officers closed the door until backup arrived. After more officers arrived, they attempted re-entry. They found Ms. Schneider standing in her bedroom door with a knife. Moments later, the officers fired ten shots, killing her.

210.    In March 2002, Minneapolis Police responded to a 911 call reporting a man walking with a machete near the Phillips neighborhood. The man, later identified as Abu Kassim Jeilani, was a Somali immigrant experiencing a mental health crisis. Officers approached Mr. Jeilani with weapons drawn and issued commanded in English, which he reportedly did not speak. When Mr. Jeilani did not comply, officers fired multiple rounds, striking him six times and killed him. No mental health professionals or crisis-trained officers were dispatched to the scene.

211.    In September 2010, Minneapolis Police did not call mental health professionals when responding to a report of a man in the midst of a mental health crisis disturbing patrons at the downtown Minneapolis YMCA. The man died after two Minneapolis Police officers placed the man, David Smith, into a prone restraint and knelt on his back for four minutes. His family brought suit against the City and the City approved a $3 million settlement in June 2013.

212.    In December 2019, Minneapolis Police failed to call mental health professionals when they responded to a 911 call for shots fired into the home of Chiasher Vue. Mr. Vue was in the midst of a mental health crisis and suffering from untreated depression when a night of drinking and karaoke turned into a series of quarrels with his family.

One of Mr. Vue's sons called 911. When police arrived, one of Mr. Vue's sons who was detained in a squad car told police that his dad was mentally ill and to let him and his sister speak to him. The officer told the son, "you're not getting out of the squad. Stop asking." Mr. Vue later came out of the house with a rifle, and Minneapolis Police fired at him at least several dozen times, killing the 52-year-old Laotian refugee.

### CLAIMS FOR RELIEF
#### COUNT 1: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT EXCESSIVE FORCE AGAINST DEFENDANT OFFICERS SERAPHINE AND PEARSON

213.    Officers Seraphine and Pearson responded to the scene of Andrew Sundberg's death in response to communication from the City police department.

214.    Officers Seraphine and Pearson responded to the scene of Andrew Sundberg's death wearing SWAT uniforms as prescribed by the City police department and carrying City police department authorized weapons.

215.    Officers Seraphine and Pearson were involved in the killing of Andrew Sundberg in the course of their employment as employees of the City police department.

216.    Officers Seraphine and Pearson killed Andrew Sundberg under color of state law.

217.    Andrew Sundberg was not in a position to intentionally harm anyone at the time Officers Seraphine and Pearson killed him.

218.    Officers Seraphine and Pearson seized Andrew Sundberg within the meaning of the Fourth Amendment of the U.S. Constitution.

219.    A reasonable police officer in the position of either Officer Seraphine or Pearson would be aware that the likelihood of Andrew Sundberg being able to see and shoot a target while blinded by spotlights, at ranges in excess of 50 yards, one-handed, while hanging out of a window, was vanishingly small.

220.    Andrew Sundberg's interest in his life outweighed the interests of Officers Seraphine and Pearson in seizing Andrew Sundberg at the time the Officers fired.

221.    Officers Seraphine and Pearson violated Andrew Sundberg's Fourth Amendment right to be free from unreasonable seizure.

222.    A reasonable officer in the place of Officers Seraphine and Pearson would know that deadly force was only authorized if Andrew Sundberg posed an imminent threat of deadly harm or great bodily harm.

223.    Officers Seraphine and Pearson are not entitled to qualified immunity.

224.    Andrew Sundberg, Plaintiff and Andrew Sundberg's mother and eight siblings have been harmed by the actions of Officers Seraphine and Pearson in an amount in excess of $100,000, to be determined by a jury.

### COUNT 2: WRONGFUL DEATH AGAINST DEFENDANT OFFICERS SERAPHINE AND PEARSON

225.    Plaintiff restates the facts of the Complaint.

226.    Officers Seraphine and Pearson intentionally fired their sniper rifles at the chest of Andrew Sundberg, knowing that doing so constituted deadly force.

227.    A reasonable police officer in the place of Officers Seraphine and Pearson would know that deadly force was authorized if Andrew Sundberg posed a threat of death or bodily harm.

228.    A reasonable police officer in the place of Officers Seraphine and Pearson would be aware that the likelihood of Andrew Sundberg being able to see and shoot a target while blinded by spotlights, at ranges in excess of 50 yards, one-handed, while hanging out of a window, was vanishingly small.

229.    Officers Seraphine and Pearson wrongfully killed Andrew Sundberg.

230.    Plaintiff, Andrew Sundberg's mother and eight siblings have been harmed in an amount in excess of $100,000 to be determined by a jury.

**COUNT 3: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT EXCESSIVE FORCE AGAINST DEFENDANT SERGEANT KELLY**

231.    Plaintiff restates the facts of the Complaint.

232.    Minneapolis Police Sergeant  Shawn Kelly was acting in a supervisory capacity at the scene described in the facts of the complaint.

233.    Sergeant Kelly knew that stating a threat by Andrew Sundberg to shoot police officers would make officers on scene more likely to use deadly force against Andrew Sundberg.

234.    Sergeant Kelly acted with reckless disregard toward Andrew Sundberg and his constitutional rights when he falsely stated that Andrew Sundberg had stated that he would shoot at police officers.

235.   As a result of Sergeant Kelly's reckless disregard in falsely stating a threat to the lives of police officers, Officers Seraphine and Pearson fired their sniper rifles, killing Andrew Sundberg.

236.   As a result of the firing of sniper rifles, Andrew Sundberg suffered pain and fear, and the parents and siblings of Andrew Sundberg have suffered the loss of his comfort and counsel, in an amount exceeding $100,000.

## COUNT 4: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (TITLE II) ALL DEFENDANTS

237.   Plaintiff restates the facts of the Complaint.

238.   Andrew Sundberg suffered from a mental impairment which limited one or more life activities.

239.   Andrew Sundberg's disability had been recognized by his school which had a record of his impairment.

240.   Andrew Sundberg's disability had been regarded by neighbors as having an impairment.

241.   Andrew Sundberg's disability had been described to the MPD by his parents.

242.   Andrew Sundberg's disability was described to Officer Richard Walker who brought that knowledge to the attention of the MPD supervisors on the scene, including Lieutenant Thomas Campbell, the commanding officer.

243.   Police Services fall under the scope of services, programs or activities of government agencies which Title II of the Americans with Disabilities Act forbids agencies from discriminating in the provision of.

244.    Andrew Sundberg's parents requested that a Black officer negotiate with their son.

245.    Minneapolis operates its own 911 service, MECC.

246.    Minnesota Statute 403.03 Subd. 1(b) requires 911 services to dispatch mental health crisis teams where available.

247.    The City of Minneapolis has a 24/7 behavioral crisis response team available to answer calls from MECC and the City.

248.    Hennepin County has a 24/7 mental health crisis team.

249.    The Hennepin County mental health crisis team is available to answer calls from MECC and the City.

250.    Minneapolis Police Policy Manual includes provisions requiring special care in employing use of force against citizens with mental health issues and communication with mentally ill suspects.

251.    The Defendants failed to respond to Andrew Sundberg's parents request for an accommodation.

252.    The Defendants failed to accommodate Andrew Sundberg's disability by requesting a mental health crisis team.

253.    The Defendants failed to accommodate Andrew Sundberg's disability by following their own policy manual.

254.    It was possible to make these accommodations without posing a threat to public safety, as the scene was under control according to Sgt. Carlson.

255.    Instead, Defendants acted with deliberate indifference toward Andrew Sundberg.

256. Citizens in the throes of mental health crisis are many times more likely to die in encounters with the police than citizens not in mental health crisis.

257. The City discriminated against the mentally ill in its emergency services.

258. Defendants had knowledge of the consequences of failure to make reasonable accommodations.

259. Andrew Sundberg's death was a consequence of the Defendants' failures to make reasonable accommodations for Andrew Sundberg's mental state.

260. Andrew Sundberg, his parents, and his eight siblings were damaged by the Defendants' failures to make reasonable accommodations for Andrew Sundberg's disability, in the loss of his comfort and counsel, in an amount in excess of $100,000.

## COUNT 5: 42 U.S.C. §1983–MONELL LIABILITY AGAINST THE CITY OF MINNEAPOLIS

261. Plaintiff restates the facts of the Complaint.

262. The City engaged in a pattern or practice of discrimination against the mentally ill in the provision of emergency services, as stated in the DOJ report, the MDHR report, and the multiple cases set forth in the facts of the Complaint.

263. The City's training of police officers in communicating with the mentally ill was inadequate, as stated in the DOJ report.

264. Andrew Sundberg was mentally ill.

265. Andrew Sundberg's Fourth Amendment rights to be free from unreasonable search and seizure were violated as a result of the City's pattern or practice of discrimination

and of inadequate training in regards to provision of emergency service to the mentally ill.

266.    The family of Andrew Sundberg was irreparably harmed by the City's misconduct, through his pain and fear, and by the loss of Andrew Sundberg's comfort and counsel, in an amount exceeding $100,000.

## RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

1. Issue an order granting Plaintiff's judgment against Defendants, finding that Defendants violated Plaintiff's federally protected Constitutional and statutory rights as well as Plaintiff's common law rights under Minnesota state law;

2. Order injunctive relief providing that the City must employ mental health professionals in extended standoffs, and providing officers with training in communications with the mentally ill.

3. Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

4. Award of punitive damages to Plaintiff, pursuant to *Smith v. Wade*, 461 U.S. 30 (1983);

5. Award of such other and further relief as this Court may deem appropriate.

**THE PLANTIFF HEREBY DEMANDS A JURY TRIAL.**

/s/ Paul J. Bosman

_____    _____
Date Signed                                                    Paul J. Bosman, #0388865

    2136 Ford Parkway, #5328

    St. Paul, MN 55116

    Tel: (651) 485-7046

    paul.bosman@gmail.com

## **ACKNOWLEDGMENT**

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorneys' and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the opposing party.

/s/ Paul J. Bosman

_____    _____
Date Signed                                                    Paul J. Bosman, #0388865

    2136 Ford Parkway, #5328

    St. Paul, MN 55116

    Tel: (651) 485-7046

    paul.bosman@gmail.com